IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KIMBERLY COONS, individually and on behalf of all others similarly situated, ) ) ) ) Plaintiff, ) ) v. ) ) ) YUM! BRANDS, INC., TACO BELL ) FRANCHISOR, LLC, and BELL ) AMERICAN GROUP, LLC, ) ) Defendants. ) | Case No. 3:21-CV-00045-SPM  JURY TRIAL DEMANDED Hon. Stephen P. McGlynn |

**PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT**

Plaintiff Kimberly Coons ("Coons" or "Plaintiff") brings this Amended Class Action Complaint and Demand for Jury Trial against Defendants Yum! Brands, Inc. ("Yum"), Taco Bell Franchisor, LLC ("Taco Bell"), and Bell American Group, LLC ("Bell American", together with Yum and Taco Bell, "Defendants")  to put a stop to their unlawful collection, use, and storage of Plaintiff's and putative class members' ("Class members'") sensitive biometric identifiers and biometric information, to have Defendants return or destroy the biometric information, including fingerprints, that it has retained for over three years and for which the initial use is no longer pertinent, to issue a written retention policy governing the use of biometric data, among other things, and to institute policies and procedures in the case of Yum and Taco Bell, to prevent the unlawful taking and maintenance of biometric data.  Plaintiff further seeks statutory damages. Plaintiff, for her Amended Class Action Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, based upon counsel's due diligent investigation, publicly available documents, and conduct

1

and statements of Defendants.

## NATURE OF THE ACTION

1. Defendant Yum! Brands is a North Carolina corporation that operates restaurant brands including Taco Bell, KFC and Pizza Hut. It franchises many of its fast food restaurants, including a significant number of Taco Bell branded restaurants operating in Illinois, through its subsidiary, Defendant Taco Bell Franchisor, LLC ("Taco Bell"). At some point prior to 2017, and while Plaintiff was employed as a manager of the Taco Bell restaurant located in Caseyville, Illinois, Bell American became the franchisee of that restaurant and of many other Taco Bell restaurants located in Illinois.

2. Some time after Bell American became the franchisee, the Caseyville and other Taco Bell restaurants in Illinois converted from using a card method of keeping employee time, to a biometric time keeping system.

3. Under this system, when employees first began their jobs tenures at Taco Bell, they were required to scan their fingerprint into its biometric time tracking system as a means of authentication and identifying them, instead of using key fobs or other identification cards. Thereafter, they were required to scan their fingerprints in order to clock in and out for their shifts and for breaks and in some cases to log into the computer system in order to, for example, deal with employee meals, and customer orders.

4. While there may be certain benefits to using biometric time clocks in the workplace, there are also serious risks. Unlike key fobs or identification cards—which can be changed or replaced if stolen or compromised—fingerprints are unique, permanent biometric identifiers associated with the employee.

5. This exposes employees to serious and irreversible privacy risks. For example, if a fingerprint database is hacked, breached, or otherwise exposed, employees have no means by

2

which to prevent identity theft and unauthorized tracking.

6.     Recognizing the need to protect its citizens from situations like these, Illinois enacted the Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA"), specifically to regulate companies that collect and store Illinois citizens' biometrics, such as fingerprints, including but not limited to employees.

7.     Despite this law, Defendants Yum and Taco Bell, through their control of the processes, procedures and policies that they imposed upon the Caseyville and other Taco Bell franchises in Illinois, and Bell American, directly as Plaintiff's employer in control of her working conditions, disregarded the statutorily protected privacy rights of Plaintiff and other employees and unlawfully collected, stored, and used their biometric data in violation of the BIPA, or instituted processes and procedures that resulted in the unlawful collection of such biometric information

8.     Specifically, Defendants Yum and Taco Bell, directly violated BIPA through their control over the restaurants' point of sale or POS systems and other computer and information systems and their time keeping policies, and through their privacy related policies which impacted Plaintiff and other Yum employees.

9.     They also acted as joint employers with Defendant Bell American, and as joint employers violated (and continue to violate) BIPA because they did not:

- Properly inform Plaintiff and the Class members in writing of the specific purpose and length of time for which their fingerprints were being collected, stored, and used, as required by the BIPA;

- Provide a publicly available retention schedule and guidelines for permanently destroying Plaintiff's and the Class's fingerprints, as required by the BIPA;

- Receive a written release from Plaintiff or the members of the Class to collect,

3

capture, or otherwise obtain their fingerprints, as required by the BIPA; and

- Destroy Plaintiff's and other Class members biometric data in a timely manner in accordance with BIPA.

10. Accordingly, this Complaint seeks an order: (i) declaring that Defendants' conduct violated and continues to violate BIPA; (ii) requiring Defendants to cease the unlawful activities discussed herein and to institute proper procedures for the taking and storing of biometric data as required by BIPA, including providing that such procedures be included in any franchise agreements for any franchised restaurants located in Illinois; (iii) awarding liquidated damages to Plaintiff and the proposed Class; and (iv) awarding Plaintiff statutory damages for such violations.

## PARTIES

11. Plaintiff Kimberly Coons is a natural person and citizen of the State of Illinois, who worked at various Taco Bell stores in Illinois. From about 2014 to 2017, Plaintiff was one of the managers of the Taco Bell store in Caseyville, Illinois and had her fingerprints taken and used each time that she clocked in or out or used the POS system. During at least part of that time, Bell American was the franchisee that operated that restaurant.

12. Defendant Yum! Brands, Inc. is a North Carolina corporation with its principal place of business in Louisville, Kentucky. Defendant is thus a citizen of the states of North Carolina and Kentucky. Yum operates the restaurant brands KFC, Pizza Hut, Taco Bell, The Habit Burger Grill, and WingStreet.

13. In particular, through its subsidiaries, including Taco Bell, Yum franchises stores for operation in Illinois and in this District, and receives royalties from such stores. Taco Bell acts as Yum's alter ego as its franchising subsidiary. Yum operates over 325 fast food restaurants in the state of Illinois, either directly or through its franchised restaurants. It further has an office at 444 N. Michigan Avenue in Chicago, where it maintains a large technology development facility,

among other things.

14. Defendant Taco Bell is a subsidiary of Yum that franchises Yum's restaurants, and upon information and belief, was a party to the franchise agreement for the Caseyville restaurant and the other about 277 Taco Bell restaurants located in Illinois. Taco Bell is a Delaware limited liability company with a principal place of business in Irvine, California.

15. Defendant Bell American Group, LLC is the second largest Taco Bell franchisee in the country. It was formed in Delaware and has its principal place of business in Independence, Ohio. Bell American operates approximately 15 Taco Bell restaurants in Illinois, including the Caseyville restaurant.

## JURISDICTION AND VENUE

16. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) (the "Class Action Fairness Act") because at least one defendant is diverse from one plaintiff, the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, and there are 100 or more members of the Class. Because it is estimated that the Class will have hundreds of members and Defendants' intentional and reckless violations of BIPA are punishable by statutory damages of $5,000 per violation, the amount in controversy is well in excess of $5,000,000.

17. This Court has personal jurisdiction over Yum as the parent corporation of Taco Bell, which is its agent and over which it exercises control. Taco Bell, which was the franchisor that franchised the Illinois restaurants for Yum, is Yum's subsidiary and is Yum's alter ego. Additionally, Yum does business in Illinois. It owns and maintains the brands KFC, Pizza Hut, Taco Bell, the Habit Burger and WingStreet restaurants, of which over 325 such restaurants are located in Illinois. Yum further has an office in this judicial district from which it directs corporate activities. Therefore, Yum maintains continuous and systemic contacts with the State of Illinois so that it is "at home" here and directs corporate activities from the State of Illinois sufficient to

provide a basis for the exercise of personal jurisdiction over it.

18. This Court has personal jurisdiction over Taco Bell and Bell American because the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from this District. Taco Bell, as the franchisor, had control over the Taco Bell restaurants' systems, procedures and privacy policies, including bookkeeping, record retention, and other business systems and procedures and operations, and directed the franchisees as to which computer and information technology software they could purchase and operate. It also trained certain of the franchisee's personnel.

19. Taco Bell further provided the franchisees with record keeping systems and forms, which the franchisees were required to employ, and maintained the right to confer with restaurant employees and customers and to inspect the franchisee's books, records, and tax returns which were required to be maintained on the premises of the restaurant or at another place as agreed to between Taco Bell and the franchisee.

20. Taco Bell further retained the right at any time and without notice to have its representatives enter the premises for the purpose of inspecting it for any reasonable purpose.

21. Bell American collected data directly in Illinois from Plaintiff and Illinois-based employees and exposed residents of Illinois to ongoing privacy risks within Illinois based on the collection, capture, obtainment, disclosure, redisclosure and dissemination of their biometric identifiers and information.

22. Defendants' deliberate gathering of Illinois users' personally identifiable information and/or their control of policies, procedures, and information and data systems which allowed for the collection of this biometric information, is intentionally targeted toward Illinois residents, including Plaintiff and the Class, and constitutes purposeful activity directed at devices and individuals in Illinois.

23. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred in Illinois. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Defendants.

## FACTUAL BACKGROUND

### I. The Biometric Information Privacy Act.

24. BIPA seeks to safeguard individuals' biometric identifiers and information.

25. In the early 2000's, major national corporations started using Chicago and other locations in Illinois to test "new [consumer] applications of biometric-facilitated financial transactions, including finger-scan technologies at grocery stores, gas stations, and school cafeterias." 740 ILCS 14/5(b). Given its relative infancy, an overwhelming portion of the public became weary of this then-growing, yet unregulated technology. *See* 740 ILCS 14/5.

26. In late 2007, a biometrics company called Pay By Touch—which provided major retailers throughout the State of Illinois with fingerprint scanners to facilitate consumer transactions—filed for bankruptcy. That bankruptcy was alarming to the Illinois Legislature because suddenly there was a serious risk that millions of fingerprint records—which, are unique biometric identifiers, which can be linked to people's sensitive financial and personal data— could now be sold, distributed, or otherwise shared through the bankruptcy proceedings without adequate protections for Illinois citizens. The bankruptcy also highlighted the fact that most consumers who had used that company's fingerprint scanners were completely unaware that the scanners were not actually transmitting fingerprint data to the retailer who deployed the scanner, but rather to the now-bankrupt company, and that their unique biometric identifiers could now be sold to unknown third parties.

27. Recognizing the "very serious need [for] protections for the citizens of Illinois when it [came to their] biometric information," Illinois enacted the BIPA in 2008. *See* Illinois House

Transcript, 2008 Reg. Sess. No. 276; 740 ILCS 14/5.

28. BIPA is an informed consent statute which achieves its goal by making it unlawful for a company to, among other things, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it *first*: (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and (3) receives a written release executed by the subject of the biometric identifier or biometric information.740 ILCS 14/15(b) (emphasis added).

29. BIPA specifically applies to employees who work in the State of Illinois. BIPA defines a "written release" specifically "in the context of employment [as] a release executed by an employee as a condition of employment." 740 ILCS 14/10.

30. Biometric identifiers include retina and iris scans, voiceprints, scans of hand and face geometry, and—most importantly here—fingerprints. *See* 740 ILCS 14/10.

31. Biometric information is separately defined to include any information based on an individual's biometric identifier that is used to identify an individual. *See id.*

32. BIPA also establishes standards for how employers must handle Illinois employees' biometric identifiers and biometric information. *See* 740 ILCS 14/15(c)–(d). For instance, BIPA requires companies to develop and comply with a written policy—made available to the public—establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting such identifiers or information has been satisfied or within three years of the individual's last interaction with the company, whichever occurs first. 740 ILCS 14/15(a).

II. **Yum's Code of Conduct And Right of Control or Direction With Respect to Employee Conduct and/or Work Environment**

8

33. Yum's Code of Conduct explicitly addresses the privacy of its employees. It states under the Privacy and Confidentiality provision that:

> Yum! believes in respecting the confidentiality of our employees' and customers' personal information. Personal information is information that can be used (alone or in conjunction with other information) to uniquely identify an individual. Different jurisdictions vary on the exact definition, but personal information often includes government-issued identification numbers, full date of birth, and bank account numbers. Access to personal information should be limited to Company personnel who have appropriate authorization and a clear business need for that information. Employees who have access to personal information must use it appropriately and treat it confidentiality and comply with all applicable laws and policies.

34. Yum's Code of Conduct further describes its expectations with regard to the collection of private information, explaining that:

> Yum! Expectations:
> \> Collect, process and use sensitive personal information for legitimate purposes only.
> \> Use anonymous, partial or replacement data wherever practical (e.g., company-issued identification numbers in place of social security numbers).
> \> Use encrypted files and devices to store and transmit personal information to prevent its unauthorized access.

35. In other words, Yum's policies explicitly direct the use and collection of employees' confidential and private data, including that of its franchisees.

36. Yum's Code of Conduct, further states under Yum! Expectations that all employees must "[f]ollow [Yum's] security guidelines to protect employees, facilities, information and technology assets," and applied to all Yum employees, even those employed by a subsidiary, explaining:

> Who is required to follow this Code? The Code applies to employees of Yum! Brands, Inc. and of its wholly owned subsidiaries (KFC, Pizza Hut, Taco Bell and The Habit) (collectively, "Yum!" or the "Company"), regardless of title, stature or tenure. This includes our board of directors, managers and individual contributors globally. Unless otherwise indicated, all references in this Code to employee(s) shall be interpreted as references to both employee(s) and director(s).

37.     The Code of Conduct further states:

> In today's global business climate, the standards and expectations for responsible conduct are more demanding than ever. Yum!'s Global Code of Conduct gives us all direction to navigate that environment. *The Code provides an introduction to important laws and policies that apply to everyone who works for Yum! or one of its brands throughout the world.* The Code is also a global resource that helps each of us: > Know when to ask for advice, and > Know where we can go for guidance if we are ever unclear about the right course of action.
>  (emphasis added).

38.     In other words, Yum specifically provided the requirements respecting privacy policies applicable to everyone who worked for a Yum brand, including the employees of its franchisees.

### III.    Defendants Violate the BIPA.

39.     By the time BIPA passed through the Illinois Legislature in mid-2008, many companies who had experimented with using biometric data as an authentication method stopped doing so, at least for a time. That is because Pay By Touch's bankruptcy, described in Section I above, was widely publicized and brought attention to consumers' discomfort with the use of their biometric data.

40.     Unfortunately, Defendants, either directly, or alternatively, in the case of Yum, through its agent, Taco Bell, specifically continued to collect, store, and use its employees' biometric data in violation of the BIPA or directed the policies and practices that resulted in the misuse of Plaintiff's biometric data.

41.     Specifically, when employees first begin work at one of Bell American's restaurants, they are required to have their fingerprints scanned in order to enroll them in its fingerprint database.

42.     These stores use an employee time tracking system, in some places the NCR Aloha system, that requires employees to use their fingerprints as a means of authentication. Unlike a

traditional time clock, employees have to use their fingerprint to "punch" in to or out of work, or in the case of managers, for instance, to get into the stores' computer system for other purposes, such as keeping track of employee meals, and customer orders.

43. Upon information and belief, this was a system that was required by Taco Bell. Under the franchise agreement, the franchisee, or Bell American, was required to strictly conform with Taco Bell's system, "including standards, specifications, systems, procedures, requirements and instructions" contained in both the franchise agreement and the operations manual, providing Taco Bell and its parent, Yum, with control over the system that Bell American used.

44. Moreover, under the franchise agreement, the franchisee, Bell American, and at least one restaurant manager, were required to be trained by Taco Bell, again giving it and Yum control over the systems used in the particular restaurants.

45. The franchisee, Bell American, was responsible for the compliance of its restaurants, with the standards, methods, techniques and material taught by Taco Bell at its operations training course and was required to cause all restaurant employees to be trained in such standards, methods, and techniques as were relevant to their respective duties.

46. Neither Taco Bell nor Yum informed employees or required its franchisees located in Illinois, including Bell American, to inform their employees of the complete purposes for which they collected sensitive biometric data or to whom the data is disclosed, if at all, and failed to obtain their knowing consent to use their biometric data, and Bell American failed to do so.

47. Neither Taco Bell nor Yum provided to franchisee employees or required Bell American to provide to its employees a written, publicly available policy identifying its retention schedule, and guidelines for permanently destroying its employees' fingerprints when the initial purpose for collecting or obtaining their fingerprints is no longer relevant, as required by the BIPA, and Bell American failed to provide such policy or to destroy such information. An employee who

leaves the company does so without any knowledge of when their biometric identifiers will be removed from Defendants' databases -- or if they will ever be.

48. The Pay By Touch bankruptcy that catalyzed the passage of BIPA highlights why conduct such as Bell American, whose employees are aware that they are providing biometric identifiers but are not aware of to whom or the full extent of the reasons they are doing so—is so dangerous. That bankruptcy spurred Illinois citizens and legislators to realize a critical point: it is crucial for people to understand when providing biometric data who exactly is collecting it, who it will be transmitted to, for what purposes, and for how long. But Defendants, either directly, or through their agents, alter egos and subsidiaries, disregard these obligations, and instead unlawfully collect, store, and use its employees' biometric identifiers and information without proper consent.

49. Ultimately, Defendants disregard its employees' statutorily protected privacy rights by violating the BIPA.

**FACTS SPECIFIC TO PLAINTIFF**

50. Plaintiff worked for Defendants at various of its Taco Bell restaurants for about 18 years in about six to seven different locations. The last store in which Plaintiff worked was located in Caseyville, Illinois at which Bell American was the franchisee. She was employed from 2014 to 2017 at that location, during which time her fingerprints were taken and used on a daily basis.

51. While Plaintiff was working as the manager of the Caseyville location, she was told that all of the Taco Bell restaurants were converting to a system in which employee fingerprints would be scanned and used to clock employees in and out. As a manager, she also had to direct other employees to provide their fingerprints into a system that was integrated into the Taco Bell cash registers or POS systems.

52. Consequently, each time that Plaintiff and any of the employees whom she

managed, clocked in or out, or took breaks, they were required to provide Bell American with a scan of their fingerprints on a fingerprint scanner located on the facilities' cash registers. As a manager, Plaintiff was also required to provide her fingerprint when she dealt with any time records or certain other records pertaining to employees.

53. Then, upon information and belief, the fingerprint matching technology compared Plaintiff's scanned fingerprint against the fingerprint previously stored in Bell American's fingerprint database.

54. As employees, Defendants required Plaintiff to scan their fingerprint so that they could use them as an authentication method to track their time. Bell American subsequently stored Plaintiff's fingerprint data in its databases, to which, upon information and belief, the remaining Defendants had access.

55. Defendants' conduct with respect to the unlawful collection of her biometric data continued through at least 2017, when Plaintiff's employment ended.

56. Defendants never informed Plaintiff of the specific limited purposes or length of time for which it collected, stored, or used their fingerprints nor did they direct their agents to make that disclosure. Similarly, Defendants never informed Plaintiff of any biometric data retention policy it developed, nor whether it will ever permanently delete their fingerprints. They did not direct their agents to make that disclosure.

57. Plaintiff never signed a written release allowing Defendants to collect or store her fingerprints.

58. Plaintiff has continuously and repeatedly been exposed to the risks and harmful conditions created by Defendants' violations of the BIPA alleged herein.

59. Plaintiff now seeks statutory damages under the BIPA as compensation for the injuries Defendants have caused as well as injunctive or other relief.

## CLASS ALLEGATIONS

### Class Definition

60. Plaintiff brings this action pursuant to 735ILCS 5/2-801 on behalf of herself and a Class of similarly situated individuals, defined as follows:

> All citizens of the State of Illinois who, within the applicable statute of limitations, had their fingerprints collected, captured, received, otherwise obtained, or disclosed by any of the Defendants while they resided in Illinois.

61. The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, affiliates, and any entity in which the Defendants or their parents have a controlling interest and its current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

62. **Numerosity:** The exact number of Class members is unknown to Plaintiff at this time, but it is clear that individual joinder is impracticable. Defendants have collected, captured, received, or otherwise obtained biometric identifiers or biometric information from at least hundreds of employees who fall into the definition of the Class. Ultimately, the Class members will be easily identified through Defendants' records.

63. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a) whether Defendants collected, captured, or otherwise obtained Plaintiff's and the

14

        Class's biometric identifiers or biometric information and/or otherwise were responsible for the biometric and privacy policies instituted at the restaurants in issue;

b) whether Defendants properly informed Plaintiff and the Class of its purposes for collecting, using, and storing their biometric identifiers or biometric information;

c) whether Defendants obtained a written release (as defined in 740 ILCS 14/10) to collect, use, and store Plaintiff's and the Class's biometric identifiers or biometric information;

d) whether Defendants have sold, leased, traded, or otherwise profited from Plaintiff's and the Class's biometric identifiers or biometric information;

e) whether Defendants developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within three years of their last interaction, whichever occurs first;

f) whether Defendants comply with any such written policy (if one exists); and

g) whether Defendants used Plaintiff's and the Class's fingerprints to identify them.

64. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class.

65. **Appropriateness**: This class action is appropriate for certification because class proceedings are superior to all others available methods for the fair and efficient adjudication of this

controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class are likely to have been small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in their Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

## CAUSE OF ACTION
### COUNT I
**Violation of 740 ILCS 14/1, *et seq.***

**(On Behalf of Plaintiff and the Class)**

66.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

67.     BIPA requires companies to obtain informed written consent from employees before acquiring their biometric data. Specifically, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless [the entity] first:

(1)     informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored;

(2)     informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; *and*

(3)     receives a written release executed by the subject of the biometric identifier or

biometric information…." 740 ILCS 14/15(b) (emphasis added).

68. BIPA also mandates that companies in possession of biometric data establish and maintain a satisfactory biometric data retention (and--importantly--deletion) policy. Specifically, those companies must: (i) make publicly available a written policy establishing a retention schedule and guidelines for permanent deletion of biometric data (*i.e.*, when the employment relationship ends); and (ii) actually adhere to that retention schedule and actually delete the biometric information. *See* 740 ILCS 14/15(a).

69. Defendants failed to comply with these BIPA mandates.

70. Defendants as corporations or limited liability companies qualify as "private entities" under the BIPA. *See* 740 ILCS 14/10.

71. Plaintiff and the Class are individuals who had their "biometric identifiers" collected by Defendants (in the form of their fingerprints), as explained above. *See* 740 ILCS 14/10.

72. Plaintiff's and the Class's biometric identifiers or information based on those biometric identifiers were used to identify them, constituting "biometric information" as defined by the BIPA. *See* 740 ILCS 14/10.

73. Defendants violated 740 ILCS 14/15(b)(3) by failing to obtain written releases from Plaintiff and the Class before it collected, used, and stored their biometric identifiers and biometric information.

74. Defendants violated 740 ILCS 14/15(b)(1) by failing to inform Plaintiff and the Class in writing that their biometric identifiers biometric information was being collected and stored.

75. Defendants violated 740 ILCS 14/15(b)(2) by failing to inform Plaintiff and the Class in writing of the specific purpose and length of term for which their biometric identifiers or

biometric information was being collected, stored and used.

76. Defendants violated 740 ILCS 14/15(a) by failing to publicly provide a retention schedule or guideline for permanently destroying its employees' biometric identifiers and biometric information.

77. By collecting, storing, and using Plaintiff's and the Class's biometric identifiers and biometric information as described herein, Defendants violated Plaintiff's and the Class's rights to privacy in their biometric identifiers or biometric information as set forth in the BIPA, 740 ILCS 14/1, *et. seq.*

78. On behalf of themselves and the Class, Plaintiff seeks:

(A) Injunctive and equitable relief as necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with the BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as described herein;

(B) statutory damages of $1,000 per violation for each of Defendant's negligent violations of the BIPA pursuant to 740ILCS 14/20(1); and

(C) reasonable attorneys' fees and costs and expenses pursuant to 740 ILCS14/20(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, respectfully requests that the Court enter an Order:

A. Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as representative of the Class, and appointing her counsel as Class Counsel;

B. Declaring that Defendants' actions, as set out above, violate BIPA;

C. Awarding statutory damages of at least $1,000 for each of Defendants' violations of the BIPA, pursuant to 740 ILCS 14/20(1);

D. Awarding injunctive and other equitable relief as is necessary to protect the interests

of the Class, including an Order requiring Defendant to collect, store, and use biometric identifiers or biometric information in compliance with the BIPA;

  E. Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

  F. Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

  G. Awarding such other and further relief as equity and justice may require.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Date: April 28, 2021

*/s/ Nicholas R. Lange*
Nicholas R. Lange
**CARLSON LYNCH LLP**
111 W. Washington Street - Suite 1240
Chicago, IL 60602
Phone: (312) 750-1265
Fax: (312) 212-5919
Email: nlange@carlsonlynch.com

Lynda J. Grant
**THE GRANT LAW FIRM, PLLC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Phone: (212) 292-4441
Fax: (212) 292-4442
lgrant@grantfirm.com

Gary S. Graifman
Melissa R. Emert
**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Phone: (845) 356-2570
Fax: (845) 356-4335
ggraifman@kgglaw.com
memert@kgglaw.com

*ATTORNEYS FOR PLAINTIFF AND THE PROPOSED CLASS*