## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

KIMBERLY COONS, individually )
and on behalf of all others similarly situated, )
                                )     Case No. 3:21-CV-00045-SPM
                                )
           Plaintiff,           )
                                )
     v.                       )
                                )     JURY TRIAL DEMANDED
                                )
                                )     Hon. Stephen P. McGlynn
YUM! BRANDS, INC., YUM         )
RESTAURANT SERVICES GROUP, LLC, )
TACO BELL CORP., and TACO BELL )
FRANCHISOR, LLC,            )
                                )
                                )
          Defendants.        )

## <u>THIRD AMENDED CLASS ACTION COMPLAINT</u>

Plaintiff Kimberly Coons ("Coons" or "Plaintiff") brings this Third Amended Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendants Yum! Brands, Inc. ("YBI"), Yum Restaurant Services Group, LLC ("YRSG"), Taco Bell Corp. ("TBC"), and Taco Bell Franchisor, LLC ("Franchisor", collectively "Defendants") for violations of the Illinois Biometric Information Protection Act, 740 ILCS 14/1, *et seq*. ("BIPA"): (1) pursuant to 740 ILCS 14/15(a) for their failure to develop and comply with a written policy, made to the public, establishing a retention schedule, and guidelines for destroying biometric identifiers; and (2) pursuant to 740 ILCS 14/15(b), for collecting, capturing, purchasing or otherwise obtaining employee biometric data without first obtaining the consent of Plaintiff and putative class members ("Class members"). Plaintiff further seeks to have Defendants return or destroy the sensitive biometric identifiers and biometric information that they have retained, and/or over which they have had control, for over three years and/or for which the initial use is no longer pertinent, which ever

1

has occurred first. Plaintiff seeks statutory and liquidated damages.  Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, based upon counsel's due diligence investigation, which included the review of documents produced by YBI, and the depositions of Mark Lagestee ("Lagestee Dep.", Lagestee Dep. at __"), and the exhibits thereto, and the deposition of Donna Heatherly ("Heatherly Dep.", "Heatherly Dep. at __"), and the exhibits thereto, as well as publicly available documents, and the conduct and statements of Defendants.

## NATURE OF THE ACTION

1.    Plaintiff brings this class action on behalf of a putative class ("Class") consisting of all citizens of the State of Illinois who, within the applicable statute of limitations, while they resided in Illinois, had their fingerprints collected, captured, received, otherwise obtained, or disclosed by any of the Defendants.

2.    The Defendants constitute a vertically integrated structure of entities all of which are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ YRSG and TBC are effectively the only entities in the YBI-Taco Bell structure that have employees and are operational entities.

3.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮





4.    YBI, as a holding company, has no employees other than the officers supplied to it by YRSG.  Given the integrated nature of its corporate structure, both the employees for YRSG and TBC report directly to David Gibbs ("Gibbs"), YBI's Chief Executive Officer and YBI's other officers, who preside over the entire Yum! Brands corporate structure. As Heatherly admitted in her deposition, the YBI board ("Board") and its officers make policies that influence TBC, and the other Taco Bell entities.  Heatherly Dep. at 36.

5.    The remaining Taco Bell related corporate entities in the diagram are effectively

pass throughs or entities created for a single purpose.[1]

6.     YBI publicly represents itself in its corporate filings and promotional material as a single, unified organization, down to its franchisees.

7.     For example, YBI's Form 10-K for the period ended December 31, 2020 (the "10-K")(Heatherly Ex. 5) states, "YUM, together with its subsidiaries, is referred to in this Form 10-K annual report ("Form 10-K") as the Company.  The terms 'we,' 'us' and 'our' are also used in the Form 10-K to refer to the Company."  YBI represents that it and its subsidiaries act as a single, unified organization, with YBI acting as the controlling parent entity.  Examples include:

- "[T]he Company invests a significant amount of time working with the franchise community and their representative organizations on key aspects of the business, including products, equipment, operational improvements and standards."  (10-K at 5)

- "The Company and franchisees of the Concepts[2] are substantial purchasers of a number of food and paper products, equipment and other restaurant supplies."  (10-K at 5)

- "If a significant franchisee of one of *our* Concepts becomes . . . financially distressed, *our* operating results could be impacted through reduced or delayed fee payments that cause *us* to record bad debt expense, reduced advertising fund contributions, and reduced new unit development."  *Id.* at 11 (Emphasis added).

8.     YBI is clear that "[t]hrough its Concepts, *YUM* develops, *operates* and franchises a worldwide system of both traditional and non-traditional Quick Serve Restaurants ('QSR')."  *Id.*

---

[1] ████████████████████████████████████████████████████████████████████████████████████████████████ and both are controlled by TBC pursuant to a management agreement ("Management Agreement") entered into in May 2016.

[2] Taco Bell, KFC, Pizza Hut, Habit Burger and Wing Street.

at 5 (Emphasis added).

9.      In 2013, when Plaintiff was employed as a manager of the Taco Bell restaurant located in Caseyville, Illinois, Bell American Group, LLC ("Bell American") became the franchisee of that restaurant and many other Taco Bell branded restaurants located in Illinois pursuant to franchise agreements with TBC.  As further discussed below, Bell American is one of YBI's largest franchisees, and thus one with which it has a direct relationship as it is "particularly important to [its] business."  10-K at 4.

10.     Sometime after Bell American became the franchisee, Caseyville and likely the hundreds of other restaurants that Bell American had purchased in Illinois, converted from using a card or password method of keeping employee time to a biometric time keeping system.

11.     Under this system, when employees first began their job tenures at Taco Bell, they were required to scan their fingerprints into its biometric time tracking system as a means of authenticating and identifying them, instead of using key fobs or other identification cards. Thereafter, they were required to scan their fingerprints in order to clock in and out for their shifts and for breaks and in some cases to log into the computer system in order to, for example, deal with employee meals and customer orders.

12.     While there may be certain benefits to using biometric time clocks in the workplace, there are also serious risks. Unlike key fobs or identification cards—which can be changed or replaced if stolen or compromised—fingerprints are unique, permanent biometric identifiers associated with the employee.

13.     This exposes employees to serious and irreversible privacy risks.  For example, if a fingerprint database is hacked, breached, or otherwise exposed, employees have no means by which to prevent identity theft and unauthorized tracking.

14.     Recognizing the need to protect its citizens from situations like these, Illinois enacted BIPA, specifically to regulate companies that collect and store Illinois citizens' biometrics,

such as fingerprints, including but not limited to employees.

15.    Nonetheless, Defendants, through their control of the processes, procedures and policies that they imposed that affected the daily working conditions of employees at Caseyville, as well as their relationship with Bell American, one of their largest franchisees and one which admittedly directly affected their bottom line, disregarded the statutorily protected privacy rights of Plaintiff and other employees. Instead, they directly, unlawfully collected, stored, possessed and/or used Plaintiff's and the other employees' biometric data in violation of BIPA, and/or instituted processes, policies and procedures that resulted in the unlawful collection of such biometric information and identifiers to which they had unfettered access under the terms of their own Franchise Disclosure Document ("FDD") and franchise agreement ("Franchise Agreement").

16.    Specifically, YBI had direct influence and impact on the Taco Bell franchises and their daily routines, and indirect influence on them through its 100% owned subsidiaries, including

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████, and on whose board YBI's Senior Vice President and Corporate Controller, Dave Russell ("Russell") and its Chief Legal and Franchise Officer, Scott Catlett ("Catlett"), sat. This gave YBI control over the products including ███████████

███████████████████████████████████████████████

███████████████████████████████████████████.

17.    YBI further had a direct effect on the daily running of franchises by imposing upon them obligations under certain agreements to which it was a party. For instance, YBI entered into an agreement with Grub Hub after it made a major investment in the company. Thereafter franchisees were required to use Grub Hub for their delivery services and to reconfigure their POS systems to accommodate that delivery system, demonstrating that YBI had the ability and did directly affect their POS systems.

7

18.     As another example, YBI had a contract with ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████.

19.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████  Lagestee Ex. 17.

20.     YBI's direct impact on the daily operations of its franchisees is further confirmed in advertising that it distributed in which it specifically set policies and the terms of employment of employees, including those at the franchise level.  Lagestee Ex. 14-16; Lagestee Dep. 93.  In fact, YBI and YRSG specifically advertised for employees in Chicago for YRSG's wholly owned subsidiary, Yum Connect, located in Chicago.  Lagestee Ex. 16.

21.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████  Lagestee Ex. 17.

22.     TBC and Franchisor similarly have direct control over the daily operations of the individual franchisees, ████████████████████████████████████████

████████████████████████████████████████.  Lagestee Ex. 17.

23.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

24. ████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████

25. ████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████

26. ████████████████████████████████████ is the entity that is controlled in part by YBI whose corporate controller and chief legal officer and franchise officer sit on the board. Lagestee Dep. 123-124. ██████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████ Ex. 17.

█████████████████████████████████████████████████████

█████████████████ *Id*.

█████████████████████████████████████████████████████

████████████████████████████████████████████████. *Id*.

27.     ████, in addition to being the parent company of the 100% owned ██████, was in this instance a party to the ████████████████████████. Lagestee Ex. 13. Under the ██████████████, TBC had direct control over the daily operations of the Caseyville restaurant at which Plaintiff worked, ██████████████████████████████████



███████████████████████████████████████. Lagestee Ex. 13.

*Id.*

28.    Accordingly, Defendants YBI, YRSG, TBC and Franchisor, directly violated BIPA through their control over aspects of Bell American's restaurants, including the Caseyville restaurant in issue, and/or as joint employers.  They did this through, among other things, (a) their direct advertising for and control over the terms of employment of franchise employees, including their institution of various hiring programs, (b)████████████████████████████████

██████████████████████████████████████, (d)█████████████████████████████████████.

29.    Accordingly, this Complaint seeks an order: (i) declaring that Defendants' conduct violated BIPA; (ii) awarding liquidated damages to Plaintiff and the proposed Class; and (iii) awarding Plaintiff and the proposed Class statutory damages for such violations.

## **PARTIES**

30.    Plaintiff Kimberly Coons is a natural person and citizen of the State of Illinois, who worked at various Taco Bell branded stores in Illinois.    From about 2014 to 2017, Plaintiff was one of the managers of the Taco Bell restaurants in Caseyville, Illinois and had her fingerprints taken and used each time that she clocked in or out or used the POS system.

31.    YBI is a North Carolina corporation with its principal place of business in Louisville, Kentucky.  YBI operates the restaurant brands or Concepts KFC, Pizza Hut, Taco Bell, The Habit Burger Grill, and WingStreet.  YBI operates over 325 fast food restaurants in the State of Illinois, either directly or through its franchised restaurants.

32.    YBI is the ultimate corporate parent of its ███████████████  ███████████████ YBI uses these subsidiaries, among others, to carry out its business of operating quick service restaurants under the Taco Bell brand.

33.    YBI, through ███████████, an entity that is engaged in developing computer systems for YBI brands, and ████████████████.  YUM Connect has an office at 444 N. Michigan Avenue in Chicago, where it maintains a large technology development facility, among other things.  YBI is the Guarantor of this lease. The relationship between YBI, YRSG and Yum Connect is illustrated in the below organizational chart.



11

34.     Through its direct and indirect subsidiaries, including █████████████████, YBI franchises stores for operation in Illinois and in this District, and receives royalties from such stores and maintains an office in Illinois.

35.     YRSG is a limited liability company organized under the laws of Delaware and is a ███████████████████████████. YRSG is the operational arm of YBI, and supplies all of its officers who are YRSG employees.

36.     As YBI's operational arm, ███████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████

37.     TBC is a corporation organized under the laws of California and is a ████████ ███████████████. TBC is a party to the ████████████████ at issue here, and upon information and belief, the remaining 277 franchises in Illinois. █████████████████ █████████████ as part of Yum! Brands integrated corporate structure. Following a 2016 securitization transaction and reorganization (the "Securitization Transaction"), further discussed below, TBC has acted as YBI's alter ego, having been delegated managerial control over TB Funding, TB Holdings, and YBI's franchising subsidiary, Franchisor.

38.     Franchisor is a limited liability company organized under the laws of Delaware with a principal place of business in Irvine, California. It is a ██████████████████████ ████████████████████████████████. Franchisor was created in 2016 as part of YBI's corporate restructuring to pay off existing debt. Franchisor has no employees

and its corporate operations are controlled by YBI and TBC. ████████████████ ████████████████.

39.    Franchisor issues the FDD that is applicable to the Taco Bell franchises, including upon information and belief, the Caseyville restaurant, and approximately 277 Taco Bell restaurants located in Illinois.

<u>Non-Party</u>

40.    Non- Party Bell American Group, LLC is the second largest Taco Bell franchisee in the country.  It was formed in Delaware and has its principal place of business in Independence, Ohio.   Bell American is the operator of approximately 15 Taco Bell restaurants in Illinois, including the Caseyville restaurant. These were part of a 2013 purchase of about 64 Taco Bell restaurants in the Missouri and Illinois area by the Flynn Restaurant Group, of which Bell American is a part.

41.    Flynn Restaurant Group owns approximately 283 Taco Bell restaurants in the United States and is important to YBI's bottom line. As YBI admitted in its 10-K, "[t]he Company has franchise relationships that are particularly important to our business, such as our relationship with  . . . certain large franchisees, such as Flynn Restaurant Group, an existing YUM franchisee, which recently announced its intention to acquire approximately 950 Pizza Hut U.S. restaurants which would make it the largest operator of Pizza Hut restaurants in the U.S."  10-K at 4.

42.    YBI had periodic contact with its large franchisees, such as Bell American.  As Lagestee testified, Gibbs, YBI's Chief Executive Officer ("CEO"), and Chris Turner ("Turner"), its Chief Financial Officer ("CFO"), had communications with Bell American.  Lagestee Dep. at 25-27.

43.    Bell American is not an indispensable party to this litigation as YBI, YRSG, TBC and Franchisor are being sued for their direct control and actions over the Taco Bell franchises in Illinois, and in particular, the Caseyville restaurant. YRSG is being sued for its indirect actions as

13

████████████████████████.   Therefore, complete relief can be afforded without Bell

American.   Moreover, Defendants are being sued for damage and violations that have already

occurred.

44.    The allegations in this Complaint do not require any changes to the FDD or

Franchise Agreement. To the extent that they do, however, ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████.

45.    Notably, there is no provision in either the ██████ the applicable ██████

██████ precluding any claim that YBI, TBC or any of their subsidiaries are joint employers of

the franchise's employees.

## JURISDICTION AND VENUE

46.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) (the "Class Action

Fairness Act") because at least one defendant is diverse from one plaintiff, the aggregate amount

in controversy exceeds $5,000,000, exclusive of interests and costs, and there are 100 or more

members of the Class.  Because it is estimated that the Class will have hundreds of members and

Defendants' intentional and reckless violations of BIPA are punishable by statutory damages of

$5,000 per violation, the amount in controversy is well in excess of $5,000,000.

47.    This Court has personal jurisdiction over YBI for the reasons and facts stated in

paragraphs 6-8. 16-20, 32-34, *supra*, and 91 through 100, *infra*.

48.    Those paragraphs demonstrate that YBI has sufficient business in the State of

Illinois such that it is at home here and therefore, the Court can exercise general jurisdiction over

YBI.  It also has sufficient contact with this State such that this Court can exercise specific

jurisdiction over it as YBI has purposefully availed itself of the privilege of conducting business

in Illinois and the injury alleged herein arises out of or relates to YBI's forum related activity; that is, the degree of control it exercises over Illinois based franchises, and its control over the POS systems, the configuration of those systems, and its supply of such systems, sufficient to make it directly liable or as a joint employer.

49.    To summarize, YBI:  (1) operates, either directly or indirectly, over 325 restaurants in this State; (2) indirectly controls and has property in this state, including its indirect subsidiary, ████████, that has an office in Chicago, and whose lease YBI guarantees; (3) has control over ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████; (5) has directly affected and dictated how restaurants in this State, and upon information and belief, Bell American, configures their POS systems; (6) advertises for employees in this State, including employees for Yum Connect, and sets policies that affect employees who work for franchisees, including the Caseyville restaurant, in this State; and (7) operates in this State through its ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████.

50.    ████████████████████ obtains revenues from franchises in this State which then get rolled into its consolidated financials that it publicly files, and earns revenue from ████████████, which develops new franchises through Development Contracts that ████ enters into with franchisees in this State.

51.    This Court also has personal jurisdiction over YBI as it is the parent corporation of ████████████, which it controls and over which it is the ████████████ ████████████). YRSG, TBC and Franchisor are YBI's agents for

the operation of YBI's Taco Bell branded restaurants in Illinois and throughout the U.S. TBC manages Franchisor and ensures that YBI's detailed operational procedures (as set forth in the ███████████████████ and described more fully below) for Taco Bell branded restaurants in Illinois are strictly observed. TBC was also the signatory to the ██████████████ at issue here. Franchisor issued the █████, which references the ████████████████, which is incorporated therein. And, like YRSG and TBC, Franchisor is YBI's alter ego.

52.    Therefore, YBI maintains continuous and systemic contacts with the State of Illinois so that it is "at home" here and directs corporate activities from the State of Illinois sufficient to provide a basis for the exercise of personal jurisdiction over it.

53.    The Court has personal jurisdiction over YRSG as it is ████████████, and ████████████████████, the entity that has a physical office in Chicago. Yum Connect's division controller, Heatherly, is an employee of YRSG, such that YRSG is fully integrated with Yum Connnect. Yum Connect reports its revenues to YBI which rolls its revenues up as part of the consolidated revenues of YBI. Yum Connect is financed in part by YRSG as it does not earn enough to cover all its own expenses.

54.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
additionally, as alleged above, provides shared services to ████████████████.

55.    The Court has personal jurisdiction over TBC as it is a party to the ████████ ████████ at issue here, and therefore did business here. TBC is also a ████████████████, which does business here and over which the Court has personal jurisdiction.

56.    By way of the ████████████████, TBC had direct control over the Caseyville restaurant, its employees, and other employees of Taco Bell restaurants in Illinois, as the ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████. Lagestee Ex. 13, at §3.2. ████████████████

██████████████████████████████████████. *Id.*

57.    ████████████████████████████████████

██████████████████████████████████, which fees were eventually rolled

up into YBI's consolidated financials. ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████ Therefore, it

had access to and control over the biometric information collected by Caseyville.

58.    As a consequence of the Securitization Transaction that YBI and the Taco Bell

entities underwent in 2016, 2018 and 2021, TBC became the manager of certain Taco Bell related

entities including Franchisor and carries out all of the functions of Franchisor.  As stated in the

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Lagestee Ex. 17 at 3.

59.    The Court has personal jurisdiction over Franchisor as it is the entity that

promulgated and disseminated the ████, including in Illinois, which incorporates by reference the

---

[3] Notably, YBI never produced this document.

17

███████████████. Franchisor is also ████████████████████████████

60.    By way of █████████████████████████████████████████████

that Bell American and the Caseyville restaurant were required to use.

61.    Specifically, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

62.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

This provided TBC and Franchisor, at least, with unfettered access to the biometric information

contained in Bell American's POS systems.

63.    Defendants' deliberate gathering of Illinois users' personally identifiable

information and/or their control of policies, procedures, and information and data systems which

allowed for the collection of this biometric information, and their exercise of access to this

information, is intentionally targeted toward Illinois residents, including Plaintiff and the Class,

and constitutes purposeful activity directed at devices and individuals in Illinois.

64.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts

or omissions giving rise to the claims alleged herein occurred in Illinois. Alternatively, venue is

proper under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Defendants.

<u>TBC is YBI's Alter Ego</u>

65.    As a result of the Securitization Transaction, TBC became YBI's alter ego, as YBI

assigned it all of its duties under the franchise agreements for the Taco Bell branded restaurants,

and the Taco Bell group of subsidiaries.

18

66.     In 2016, YBI caused its Taco Bell division to undergo a massive corporate restructuring through a securitization transaction through which it raised capital to pay off certain debts.   A portion of the net proceeds of the Securitization Transaction were used to repay $2 billion borrowed by YBI in 2015.   Additional proceeds were also used as a return of capital to YBI's shareholders through share repurchases and/or a special dividend.

67.     As a condition of the Securitization Transaction, various of YBI's subsidiaries, including TB Funding, TB Holdings, Franchisor and TBC, together with other affiliates, entered into a Management Agreement, in which TBC was designated to act as the manager ("Manager") of TB Funding, TB Holdings, and Franchisor (as well as other affiliates).   As Manager, TBC was delegated to carry out all of the affiliates' duties and obligations under the Taco Bell franchise agreements and licensing agreements, including managing the Taco Bell system, marketing and offering new franchises, and administering the Taco Bell national advertising fund, or NAFA.

68.     Notably, TB Funding, TB Holdings and Franchisor were bound to the Management Agreement by YBI, whose Vice President and Treasurer, William Gathof, executed the Management Agreement as the authorized signatory on behalf of TB Funding, TB Holdings and Franchisor.

69.     Following the Securitization Transaction, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. 10-K at 5.

## FACTUAL BACKGROUND

70.     BIPA seeks to safeguard individuals' biometric identifiers and information.

71.     In the early 2000's, major national corporations started using Chicago and other locations in Illinois to test "new [consumer] applications of biometric-facilitated financial transactions, including finger-scan technologies at grocery stores, gas stations, and school

cafeterias." 740 ILCS 14/5(b). Given its relative infancy, an overwhelming portion of the public became weary of this then-growing, yet unregulated technology. *See* 740 ILCS 14/5.

72.    In late 2007, a biometrics company called Pay By Touch—which provided major retailers throughout the State of Illinois with fingerprint scanners to facilitate consumer transactions—filed for bankruptcy. That bankruptcy was alarming to the Illinois Legislature because suddenly there was a serious risk that millions of fingerprint records—which, are unique biometric identifiers, which can be linked to people's sensitive financial and personal data— could now be sold, distributed, or otherwise shared through the bankruptcy proceedings without adequate protections for Illinois citizens. The bankruptcy also highlighted the fact that most consumers who had used that company's fingerprint scanners were completely unaware that the scanners were not actually transmitting fingerprint data to the retailer who deployed the scanner, but rather to the now-bankrupt company, and that their unique biometric identifiers could now be sold to unknown third parties.

73.    Recognizing the "very serious need [for] protections for the citizens of Illinois when it [came to their] biometric information," Illinois enacted BIPA in 2008. *See* Illinois House Transcript, 2008 Reg. Sess. No. 276; 740 ILCS 14/5.

74.    BIPA is an informed consent statute which achieves its goal by making it unlawful for a company to, among other things, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it *first*: (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and (3) receives a written release executed by the subject of the biometric identifier or biometric information. 740 ILCS 14/15(b) (emphasis added).

75.    BIPA specifically applies to employees who work in the State of Illinois. BIPA

defines a "written release" specifically "in the context of employment [as] a release executed by an employee as a condition of employment." 740 ILCS 14/10.

76.    Biometric identifiers include retina and iris scans, voiceprints, scans of hand and face geometry, and—most importantly here—fingerprints. *See* 740 ILCS 14/10.

77.    Biometric information is separately defined to include any information based on an individual's biometric identifier that is used to identify an individual. *See id.*

78.    BIPA also establishes standards for how employers must handle Illinois employees' biometric identifiers and biometric information. *See* 740 ILCS 14/15(c)–(d).  For instance, BIPA requires companies to develop and comply with a written policy—made available to the public—establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting such identifiers or information has been satisfied or within three years of the individual's last interaction with the company, whichever occurs first.  740 ILCS 14/15(a).

## FACTS SPECIFIC TO PLAINTIFF

79.    Plaintiff worked for Defendants at various of its Taco Bell restaurants for about 18 years in about six to seven different locations.  The last restaurant in which Plaintiff worked was located in Caseyville, Illinois for which Bell American was the franchisee. She was employed from 2014 to 2017 at that location, during which time her fingerprints were taken and used on a daily basis.

80.    While Plaintiff was working as the manager of the Caseyville location, she was told that all of the Taco Bell restaurants were converting to a system in which employee fingerprints would be scanned and used to clock employees in and out.  As a manager, she also had to direct other employees to provide their fingerprints into a system that was integrated into the Taco Bell cash registers or POS systems.

81.    Consequently, each time that Plaintiff and any of the employees whom she

managed, clocked in or out or took breaks, they were required to provide a scan of their fingerprints on a fingerprint scanner located on the facility's cash registers.  As a manager, Plaintiff was also required to provide her fingerprints when she dealt with any time records or certain other records pertaining to employees.

82.    Then, upon information and belief, the fingerprint matching technology compared Plaintiff's scanned fingerprint against the fingerprint previously taken.

83.    Bell American required Plaintiff to scan her fingerprints so that they could use them as an authentication method to track their time.  Bell American subsequently stored Plaintiff's fingerprint data in its databases, to which, upon information and belief, the remaining Defendants had access.

84.    Defendants' conduct with respect to the unlawful collection and possession, including access, of her biometric data continued through at least 2017, when Plaintiff's employment ended.

85.    Defendants never informed Plaintiff of the specific limited purposes or length of time for which it collected, stored, or used her fingerprints nor did they direct their agents to make that disclosure.  Similarly, Defendants never informed Plaintiff of any biometric data retention policy it developed, or whether it will ever permanently delete her fingerprints.  They did not direct their agents to make that disclosure.

86.    Plaintiff never signed a written release allowing Defendants to collect, store or have access to her fingerprints.

87.    Plaintiff has continuously and repeatedly been exposed to the risks and harmful conditions created by Defendants' violations of BIPA alleged herein.

88.    Plaintiff now seeks statutory damages under BIPA as compensation for the injuries Defendants have caused.

## YBI IS DIRECTLY LIABLE AND/OR LIABLE
## AS A JOINT EMPLOYER UNDER BIPA

89.     As demonstrated above, YBI exercised sufficient control over the Taco Bell franchises, and the Caseyville restaurant, such that it can be held liable for directly violating BIPA.

90.     It can also be held liable as a joint employer with Bell American for its violations of BIPA. As set forth above, YBI had direct influence and control over the daily operations of the Taco Bell restaurants, including their hiring policies such that it is liable as a joint employer.

91.     Through its creation of and its controlling position on ███████████████ ████████████████████████████████████████████████████████████ ███████ YBI was able to control the POS system, including the use of fingerprint scanners, that were purchased by Taco Bell franchisees, including Bell American.[4]

92.     This is particularly significant in relation to Bell American, which was part of one of YBI's largest franchisees, and with whom Gibbs and Turner, YBI's CEO and CFO, had periodic contact given Flynn's importance to YBI's bottom line.  It is thus more than inferable given the number of Taco Bell restaurants that Bell American and the Flynn Group owned, and the quantity of food stuffs, and POS systems that they ordered, that YBI, was aware that Bell American was using fingerprint technology to clock its employees in and out.

93.     YBI further had control over franchisees' daily operations and POS systems and could require them to change their POS systems in accordance with YBI's dictates.

94.     For instance, YBI entered into contracts and agreements with third parties, such as ██████ and Grub Hub, and then required franchisees, including on information and belief, Bell American, to adhere to the terms thereof. ██████████████████████████████ ████████████████████████████████████████████████████████████

---

[4] Despite being put forward as YBI's Rule 30(b)(6) witness, as well as an individual witness, Lagestee lacked knowledge of many of the Rule 30(b)(6) subjects, particularly Defendants' communications with Bell American.

95.    YBI's or YRSG's contract with Grub Hub required even more.  That contract, which provided for Grub Hub delivery services, required franchisees to actually reconfigure their POS systems to accommodate the use of that delivery service, demonstrating that YBI had direct control over the franchisees' POS systems and their daily operations. Notably, when Grub Hub determined to terminate that contract without notice, YRSG file suit stating in pleadings that it was doing so "to enforce Franchisee rights, and the enforcement of Franchisee rights is a key goal of this action."  *Yum Restaurant Services Group, LLC, et al. v. GrubHub Holdings Inc.*, which was pending in the Supreme Court for the State of New York, New York County.

96.    YBI further had direct impact on franchisee hiring policies and the benefits and programs that were offered to franchise employees.

97.    YBI actively recruits potential employees for positions within Illinois through its website, offering specific benefits.  Lagestee Ex. 15.  For example, YBI's career page, which includes logos of its four Concepts, including Taco Bell, makes direct representations regarding hiring policies:

- "Yum! employees have access to $5,350 annually in tuition reimbursement, plus the opportunity to earn a $2,500 scholarship of the employee and/or their children."

- "Yum! offers six weeks of paid parental leave to all mothers and fathers…"

- "We offer flexible work schedules, half-day Fridays and at least four weeks of vacation."

- Our core ingredients are Food, Planet and People. We serve food people trust… We unlock employees' potential. Learn more at citizenship.yum.com."

    *Id*. (emphasis added).

24

98.     YBI further adopts and institutes global initiatives that directly affect the daily routine and operations of franchises.  For instance, in June 2022, YBI announced it was going to invest $100M to fight inequality.  Lagestee Ex. 14. In that initiative, YBI specifically stated that it was going to do so by working alongside "our franchisees". Specifically, YBI stated, "alongside our franchisees, we will tackle inequality with an emphasis on three areas that can unlock opportunity for our employees, frontline restaurant teams and communities around the world: equity and inclusion, education and entrepreneurship." *Id.*  The announcement then continued that YBI was working to increase gender parity among other things, and expanding its inclusive leadership training across all corporate offices, ***franchisees*** and restaurants around the world" (emphasis added), clearly indicating that these hiring policies would be imposed on individual franchises and their employees.

99.     Finally, in its public filings, Yum indicates that it maintains control over its franchisees, such as Bell American, through its wholly owned subsidiaries.  In its SEC filings, it represents that it has over 50,000 restaurants worldwide (including those operated by franchisees), and that "[t]hrough its Concepts, YUM develops, operates and franchises a worldwide system of . . . Quick Service Restaurants."  Yum! Brands, Inc.,'s Form 10-K for the period ended December 31, 2020 (the "2020 10-K").

100.    It further states that it is "focused on partnering with franchisees who have the commitment, capability, and capitalization to grow our Concepts" and "invests a significant amount of time working with the franchise community and their representative organizations on key aspects of the business, including products, equipment, operational improvements and standards." *Id.* at 4.

## TBC AND FRANCHISOR ARE DIRECTLY LIABLE
## AND/OR AS JOINT EMPLOYERS UNDER BIPA

101.    TBC and Franchisor are similarly either directly liable for Bell American's

violations of BIPA, or as joint employers as further set forth above.

102.   TBC is directly liable and as a joint employer, ████████████████ ████████ to whom all of the rights and obligations under the ████████████ were delegated in the Securitization Transaction, and as the ████████████████.

103.   TBC also had control over the daily operations of Taco Bell franchises through the ████████████████, to which it was a party, which incorporated the ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████

104.   ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ to ensure Bell American's compliance with the Franchise Agreement and the Franchise Operations Manual.  Therefore, it had access to and control over the biometric information collected by Caseyville.  Lagestee Ex. 13 at ████████.

105.   Franchisor is similarly liable either directly or as a joint employer for Bell American's BIPA violations.

106.   The ████ issued by the Franchisor specifically required franchisees, including Bell American, ████████████████████████████████████ ████████████████████████████████.

107.   ████████████████████████████████ ████████████████████████████████

108.   These allegations are sufficient to hold TBC and Franchisor liable for violations of BIPA.

## DEFENDANTS FAILED TO COMPLY WITH BIPA

109.    By the time BIPA passed through the Illinois Legislature in mid-2008, many companies who had experimented with using biometric data as an authentication method stopped doing so, at least for a time.  That is because Pay By Touch's bankruptcy, described above, was widely publicized and brought attention to consumers' discomfort with the use of their biometric data.

110.    Unfortunately, Defendants, either directly, or alternatively, through their subsidiaries, alter egos or agents, failed to do so.

111.    Specifically, when employees first begin work at one of the Bell American's restaurants, they are required to have their fingerprints scanned in order to enroll them in its fingerprint database.

112.    These stores use an employee time tracking system, that requires employees to use their fingerprints as a means of authentication.  Unlike a traditional time clock, employees have to use their fingerprint to "punch" in or out of work.

113.    None of the Defendants informed these employees or required its franchisees located in Illinois, including Bell American, to inform their employees of the complete purposes for which they collected sensitive biometric data or to whom the data is disclosed, if at all, and failed to obtain their knowing consent to use their biometric data, and Bell American failed to do so.

114.    None of the Defendants provided to franchisee employees or required Bell American to provide to its employees a written, publicly available policy identifying its retention schedule, and guidelines for permanently destroying its employees' fingerprints when the initial purpose for collecting or obtaining their fingerprints is no longer relevant, as required by the BIPA, and Bell American failed to provide such policy or to destroy such information.  An employee who leaves the company does so without any knowledge of when his biometric identifiers will be removed from Defendants' databases -- or if they will ever be.

115.     The Pay By Touch bankruptcy that catalyzed the passage of BIPA highlights why conduct such as that of Defendants, whose employees or joint employees are aware that they are providing biometric identifiers but are not aware of to whom or the full extent of the reasons they are doing so—is so dangerous.  That bankruptcy spurred Illinois citizens and legislators to realize a critical point: it is crucial for people to understand when providing biometric data who exactly is collecting it, who it will be transmitted to, for what purposes, and for how long. But Defendants, either directly, or through their agents, alter egos and subsidiaries, disregarded these obligations, and instead unlawfully collected, stored, possessed, and access to and/or used its employees' biometric identifiers and information without proper consent.

116.     Ultimately, Defendants disregarded the statutorily protected privacy rights of Taco Bell employees in Illinois, including Plaintiff and members of the Class, by violating BIPA.

## CLASS ALLEGATIONS

117.     Plaintiff brings this action pursuant to 735 ILCS 5/2-801 on behalf of herself and a Class of similarly situated individuals, defined as follows:

> All citizens of the State of Illinois who, within the applicable statute of limitations, while they resided in Illinois, had their fingerprints collected, captured, received, otherwise obtained, or disclosed by any of the Defendants.

118.     The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, affiliates, franchisees, agents, alter egos, and any entity in which the Defendants or their parent companies have a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

119.     **Numerosity:** The exact number of Class members is unknown to Plaintiff at this

time, but it is clear that individual joinder is impracticable. Defendants have collected, captured, received, or otherwise obtained biometric identifiers or biometric information from at least hundreds of employees who fall into the definition of the Class. Ultimately, the Class members will be easily identified through Defendants' records.

120. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a) whether Defendants collected, captured, or otherwise obtained Plaintiff's and the Class's biometric identifiers or biometric information and/or otherwise were responsible for the biometric and privacy policies instituted at the restaurant in issue;

b) whether Defendants properly informed Plaintiff and the Class of their purposes for collecting, using, and storing their biometric identifiers or biometric information;

c) whether Defendants obtained a written release (as defined in 740 ILCS 14/10) to collect, use, and store Plaintiff's and the Class's biometric identifiers or biometric information;

d) whether Defendants have sold, leased, traded, or otherwise profited from Plaintiff's and the Class's biometric identifiers or biometric information;

e) whether Defendants developed and complied with a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within three years of their last interaction, whichever occurs first;

f) whether Defendants complied with any such written policy (if one exists); and

g) whether Defendants used Plaintiff's and the Class's fingerprints to identify them.

121. **Adequate Representation**: Plaintiff will fairly and adequately represent and

29

protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class.

122.    **Appropriateness**: This class action is appropriate for certification because class proceedings are superior to all others available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class are likely to have been small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in their Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

<u>**CAUSE OF ACTION**</u>
**COUNT I**
Violation of 740 ILCS 14/1, *et seq.*

**(On Behalf of Plaintiff and the Class)**

123.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

124.    BIPA requires companies to obtain informed written consent from employees before acquiring their biometric data. Specifically, BIPA makes it unlawful for any private entity

to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless [the entity] first:

(1)    informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored;

(2)    informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; *and*

(3)    receives a written release executed by the subject of the biometric identifier biometric information…." 740 ILCS 14/15(b) (emphasis added).

125.    BIPA also mandates that companies in possession of biometric data establish and maintain a satisfactory biometric data retention (and--importantly--deletion) policy. Specifically, those companies must: (i) make publicly available a written policy establishing a retention schedule and guidelines for permanent deletion of biometric data (*i.e.*, when the employment relationship ends); and (ii) actually adhere to that retention schedule and actually delete the biometric information. *See* 740 ILCS 14/15(a).

126.    Defendants failed to comply with these BIPA mandates either directly, or through their roles as joint employers.

127.    Defendants as corporations or limited liability companies qualify as "private entities" under the BIPA. *See* 740 ILCS 14/10.

128.    Plaintiff and Class members are individuals who had their "biometric identifiers" collected by Defendants (in the form of their fingerprints), as explained above. *See* 740 ILCS 14/10.

129.    Plaintiff's and the Class's biometric identifiers or information based on those biometric identifiers were used to identify them, constituting "biometric information" as defined by the BIPA. *See* 740 ILCS 14/10.

130.    Defendants violated 740 ILCS 14/15(b)(3) by failing to obtain written releases from

Plaintiff and the Class before it collected, used, accessed and/or stored their biometric identifiers and biometric information.

131.    Defendants violated 740 ILCS 14/15(b)(1) by failing to inform Plaintiff and the Class in writing that their biometric identifiers biometric information was being collected and stored.

132.    Defendants violated 740 ILCS 14/15(b)(2) by failing to inform Plaintiff and the Class in writing of the specific purpose and length of term for which their biometric identifiers or biometric information was being collected, stored, accessed and used.

133.    Defendants violated 740 ILCS 14/15(a) by failing to publicly provide a retention schedule or guideline for permanently destroying its employees' biometric identifiers and biometric information.

134.    By collecting, storing, accessing and using Plaintiff's and the Class's biometric identifiers and biometric information as described herein, Defendants violated Plaintiff's and the Class's rights to privacy in their biometric identifiers or biometric information as set forth in the BIPA, 740 ILCS 14/1, *et. seq.*

135.    On behalf of themselves and the Class, Plaintiff seeks:

(A)    Statutory damages of $5,000 per violation for each of Defendants' intentional or reckless violations of the BIPA pursuant to 740 ILCS 14/20(1);

(B)     Statutory damages of $1,000 per violation for each of Defendants' negligent violation of the BIPA pursuant to 740 ILCS 14/20(1);

(C)    Liquidated damages; and

(D)    Reasonable attorneys' fees and costs and expenses pursuant to 740 ILCS14/20(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, respectfully requests that the Court enter an Order:

A.      Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as representative of the Class, and appointing her counsel as Class Counsel;

B.      Declaring that Defendants' actions, as set out above, violate BIPA;

C.      Awarding statutory damages of at least $1,000 for each of Defendants' negligent violations of BIPA, pursuant to 740 ILCS 14/20(1);

D.      Awarding statutory damages of at least $5,000 for each Defendants' reckless or intentional violations of BIPA, pursuant to 740 ILCS 14/20(l);

E.      Awarding liquidated damages;

F.      Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

G.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

H.      Awarding such other and further relief as equity and justice may require.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Date: September 1, 2022            */s/ Nicholas R. Lange*
                        Nicholas R. Lange
                        **LYNCH CARPENTER LLP**
                        111 W. Washington Street - Suite 1240
                        Chicago, IL  60602
                        Phone: (312) 750-1265
                        Fax: (312) 212-5919
                        Email: nickl@lcllp.com

                        Lynda J. Grant
                        **THE GRANT LAW FIRM, PLLC**
                        521 Fifth Avenue, 17th Floor
                        New York, NY 10175
                        Phone: (212) 292-4441
                        Fax: (212) 292-4442
                        lgrant@grantfirm.com

Gary S. Graifman
Daniel C.  Edelman
**KANTROWITZ, GOLDHAMER &
GRAIFMAN, P.C.**
16 Squadron Road, Suite 106
New City, New York 10952
Phone: (845) 356-2570
Fax: (845) 356-4335
ggraifman@kgglaw.com
dedelman@kgglaw.com
*ATTORNEYS FOR PLAINTIFF AND THE
PROPOSED CLASS*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 1, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, and that the electronic case filing system sent a notice of electronic filing to all parties of record.

*/s/ Nicholas R. Lange*
Nicholas R. Lange