IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KIMBERLY COONS, Individually and on Behalf of All Others Similarly Situated,<br><br>  Plaintiff,<br><br>v.<br><br>YUM! BRANDS, INC., TACO BELL FRANCHISOR, LLC, YUM RESTAURANT SERVICES GROUP LLC, TACO BELL CORP.<br><br>  Defendants. | Case No. 21-CV-45-SPM |

## MEMORANDUM & ORDER

### McGLYNN, District Judge:

Plaintiff Kimberly Coons ("Coons") brings a purported class action against defendants Yum! Brands, Inc. ("Yum!"), Taco Bell Franchisor, LLC. ("TBF"), Yum Restaurant Services Group ("YRSG"), and Taco Bell Corp. ("TBC") for alleged violations of the Illinois Biometric Privacy Act ("BIPA"), codified at 740 ILCS §14/1, *et seq*. Pending before the Court are three (3) separate motions: (1) Motion to Dismiss pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure filed by Yum and YRSG (Doc. 103); (2) Motion to Compel Arbitration pursuant to the Federal Arbitration Act ("FAA") filed by Yum!, YRSG, TBF, and TBC (Doc. 107); and, (3) Motion to Dismiss pursuant to Rules 12(b)(6) and 12(b)(7) of the Federal Rules of Civil Procedure, filed by all four defendants in the alternative to the prior two motions (Doc. 109).  For the reasons set forth below, the Court **GRANTS** the motion to compel arbitration, and further stays this case, including resolution of the motions to dismiss, pending the outcome of the arbitration.

## The Illinois Biometric Information Privacy Act

The Illinois General Assembly enacted the Illinois Biometric Information Privacy Act ("BIPA"), in 2008 to protect a person's privacy interests in his "biometric identifiers", which includes fingerprints, retina and iris scans, hand scans and facial geometry. 740 ILCS 14/1, *et seq.* (2008); *Fox v. Dakkota Integrated Systems, LLC.,* 980 F.3d 1146 (2020). BIPA was created in response to the growing use of biometrics "in the business and security screening sectors". 740 ILCS 14/5. In fact, the legislative findings refer to the immutability of biometric identifiers and the risk of identity theft, and state the following, "Biometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." 740 ILCS 14/5(c). Because "the full ramifications of biometric technology are not fully known", the General Assembly found that "the public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." *Id.* §§14/5 (f)-(g).

Section 15 of the Act comprehensively regulates the collection, use, retention, disclosure and dissemination of biometric identifiers. 740 ILCS 14/15. Specifically, § 15(a) of BIPA states:

> "A private entity in possession of biometric identifiers or information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or

within 3 years of the individual's last interaction with the private entity, whichever comes first." 740 ILCS 15/15(a).

Section 15(b) of the Act deals with informed consent and prohibits private entities from collecting, capturing, or otherwise obtaining a person's biometric identifiers or information without the person's informed written consent. *Id.* § 15(b). In other words, the collection of biometric identifiers or information is barred unless the collector first informs the person "in writing of the specific purpose and length of term for which the data is being collected, stored, and used" and "receives a written release" from the person or his legally authorized representative. *Id.*

## PROCEDURAL BACKGROUND

On January 31, 2021, Coons filed her initial class action complaint against Yum! "to put a stop to its unlawful collection, use, and storage of Plaintiff's … sensitive biometric identifiers and biometric information", "to have Defendants return and destroy the biometric information", and "to issue a written retention policy" (Doc. 1). On March 17, 2021, Yum! filed its first motion to dismiss (Doc. 21). However, prior to proceeding on this motion, the parties stipulated to plaintiff filing an amended complaint and to a briefing schedule regarding the amended pleading (Doc. 28).

On April 28, 2021, Coons filed her amended complaint against Yum!, and also asserted causes of action against TBF and Bell American Group, LLC ("Bell") (Doc. 30). Within the amended complaint, Coons asserted that Yum! and TBF directly violated BIPA, and acted as joint employers with Bell (*Id.*).

On July 20, 2021, Bell filed a motion to compel arbitration and supporting memorandum of law, referring to an executed copy of Bell's Dispute Resolution Program

(Docs. 47, 48). On that same date, Bell filed a motion and supporting memorandum to dismiss, or in the alternative, stay the case (Doc. 50, 51). Defendants Yum! and TBF also filed a motion to dismiss along with their supporting memorandum (Docs. 49, 52).

On September 20, 2021, Coons sought leave to voluntarily dismiss defendant Bell (Doc. 61). On November 29, 2021, oral argument was conducted before the Court at which time the parties also discussed the future handling of this case. On November 30, 2021, the Court entered an Order advising the parties of the proper way to dismiss and/or add a party or claim (Doc. 70).

On January 1, 2022, Coons filed her second amended complaint, which was brought against TBF and Yum! (Doc. 73). It is important to note that Bell was no longer identified as a party-defendant (*Id.*). Accordingly, all pending motions were terminated as moot (Doc. 74).

On Feb. 3, 2022, Yum! filed another motion to dismiss and supporting memorandum of law for lack of jurisdiction pursuant to the Rule 12(b)(2) of the Federal Rules of Civil Procedure (Docs. 75, 76). On that same date, Yum! and TBF also filed a motion to dismiss pursuant to Rule 12(b)(7) and 12(b)(6) and supporting memorandum of law. (Docs. 77, 78).

On March 7, 2022, Coons filed her response to the pending motions (Docs. 80, 81). She also filed a motion seeking leave to conduct jurisdictional discovery (Doc. 82). Accordingly, on March 10, 2022, this Court granted Coons sixty (60) days to conduct jurisdictional discovery while holding the pending motions in abeyance (Doc. 83).

On June 24, 2022, the Court held a scheduling conference at which time the parties discussed the status of the jurisdictional discovery (Doc. 93). Shortly thereafter,

on July 15, 2022, the parties submitted a Joint Status Report disputing the future handling of this matter (Doc. 94). On August 11, 2022, the Court granted Coons leave to file an amended complaint based upon the issues being raised in the status report (Doc. 96).

On September 1, 2022, Coons filed her third amended complaint ("TAC") against erstwhile defendants Yum! and TBF and newcomers TBC and YRSG (Doc. 98). Specifically, the TAC alleges that the defendants "constitute a vertically integrated structure of entities" with YUM "the ultimate corporate parent of its wholly owned direct and indirect subsidiaries, YRSG, TBC, and TBF" (*Id.*). Coons also raises "joint employer" and "alter ego" theories (*Id.*).

On September 16, 2022, the following three motions and supporting memorandums of law were filed by defendants herein: (1) Motion to Dismiss filed by YUM and YRSG pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, including Affidavit of Thomas E. Ahlering (Docs. 103-105); (2) Motion to Compel Arbitration pursuant to Rule 12(b)(3) filed by all defendants (Docs. 107, 108); and (3) Motion to Dismiss, in the alternative, pursuant to Rules 12(b)(6) and 12(b)(7) filed by all defendants (Docs. 109, 110).

On September 30, 2022, this Court approved the proposed briefing schedule (Doc. 123). Accordingly, on October 17, 2022, Coons filed her unredacted memorandums in opposition to the three defense motions (Docs. 134, 137, and 139). Defendants filed their respective replies on November 7, 2022 making these motions ripe (Docs. 143, 145).

On January 6, 2023 and February 24, 2023 respectively, the Court granted Coons leave to file supplemental authority, including recent decisions from the Northern

District, the Seventh Circuit, and the Illinois Supreme Court, *to wit: Giron v. Subaru of America, Inc.*, 2022 WL 17130869 (N.D. Ill. Nov. 21, 2022), *Johnson v. Mitek Systems, Inc.*, 55 F.4th 1122 (7th Cir. 2022); *Tims, et al v. Black Horse Carriers, Inc.*, 2023 IL 127801 (Ill. Feb. 2, 2023); and, *Cothron v. White Castle Systems, Inc.* 2023 IL 128004 (Ill., Feb. 17, 2023).

## FACTUAL BACKGROUND

The facts alleged by Coons are accepted as true for purposes of defendants' motions[1]. FED. R. CIV. P. 10(c); *Arnett v. Webster,* 658 F.3d 742, 751-52 (7th Cir. 2011). This Court will summarize what it deems necessary to address this motion.

Coons is a citizen of Illinois (Doc. 98, ¶ 30). She worked at various Taco Bell restaurants for approximately 18 years (Doc. 98, ¶ 79). She last worked at the restaurant in Caseyville, Illinois, which was franchised by Bell (*Id.*). From about 2014 to 2017[2], Coons was one of the managers at the Caseyville location (*Id.*). During her tenure in Caseyville, Coons was told that all the Taco Bell restaurants were converting from a card or password time system to a biometric timekeeping system (Doc. 98, ¶ 80). Under the new system, Coons was required to scan her fingerprints into the timekeeping system as a means of authentication and identification, instead of using a key fob or other authentication device (Doc. 98, ¶ 11). As a manager, Coons also had to direct other employees to provide their fingerprints into the system incorporated at the Taco Bell (Doc. 98, ¶ 80). Coons also had to use her fingerprint when she dealt with time records

---

[1]The factual information was taken directly from the TAC (Doc. 98) and will be cited accordingly.

[2] In paragraph 9, Coons indicates she was employed as a manager of the Caseyville Taco Bell in 2013; however, in paragraph 30, she claims to have been manager there from 2014 to 2017.

or other employee records (Doc. 98, ¶ 81). Bell required Coons and the other employees to scan their fingerprints to authenticate and track time (Doc. 98, ¶ 83). Bell subsequently stored Coons' fingerprint data and presumed the remaining defendants could access said date (*Id.*).

Coons left Taco Bell in 2017 and does not know if the collection and possession of fingerprint data continued (Doc. 98, ¶ 84). She does not recall being informed of the specific limited purpose or length of time the fingerprints were collected or stored, and does not know if they have been destroyed (Doc. 98, ¶ 85). She never signed a written release allowing anyone to collect, store, or have access to her fingerprints (Doc. 98, ¶ 86).

Within the TAC, Coons alleges a vertically integrated structure of entities (Doc. 98, ¶ 2). Yum! is the "ultimate corporate parent" of its wholly owned direct and indirect subsidiaries: YRSG, TBF, and TBC (Doc. 98, ¶ 32). YRSG is the operational arm of Yum! in that it provides financial and administrative support to TBC and TBF (Doc. 98, ¶ 36). YRSG also collects non-refundable fees from franchisees, including Bell (Doc. 98, ¶ 54).

TBC is a party to the franchise agreement in this case and is alleged to be a 100% owned direct subsidiary of Yum![3] (Doc. 98, ¶ 37). Coons claims TBC has direct control over the Caseyville franchise because the franchise agreement required compliance with the Operation Manual[4] (Doc. 98, ¶ 56).

TBF is a 100% wholly owned indirect subsidiary of TBC and Yum! (Doc. 98, ¶ 38). TBF has zero employees, its corporate operations are controlled Yum! and TBC, and

---

[3] Coons also claims that TBC has acted as Yum!'s alter ego (Doc. 98, ¶ 37).
[4] The Operations Manual was incorporated by reference into the Franchise Agreement.

many of its administrative functions are performed by YRSG (*Id.*). TBF issues the Franchise Disclosure Document ("FDD") to the Taco Bell Franchises, including former party-defendant, Bell American Group, LLC "Bell" (Doc. 98, ¶ 39).

Bell is the second largest Taco Bell franchisee in the county, and the restaurant located in Caseyville, Illinois is one of its properties (Doc. 98, ¶ 40). Yum! had periodic contact with Bell; however, Coons claims that Bell is not an indispensable party because Yum!, YRSC, TBC, and TBF are being sued for their direct control and indirect actions over the Caseyville restaurant (Doc. 98, ¶¶ 42, 43). There is no provision in the FDD or applicable franchise agreement precluding any claim that Yum!, TBC, or any of their subsidiaries are joint employers of Bell's employees (Doc. 98, ¶ 45).

Bell paid a successor franchise fee for the Caseyville restaurant to TBC, as well as periodic fees and a marketing fee (Doc. 98, ¶ 57). TBC kept a marketing fund for the Caseyville restaurant, and under the franchise agreement, TBC has the right to enter the restaurant to ensure Bell's compliance with the Franchise Agreement and Operations Manual, which Coons claims gave them access to and control over any biometric information collected by the Caseyville restaurant (*Id.*).

Coons asserts that TBF directed the POS and computer systems used in its franchises and had unlimited access to the information, including biometric information, that was being captured (Doc. 98, ¶ 61). Coons further claims that TBC also had unfettered access to said biometric information (Doc. 98, ¶ 62).

In 2016, Yum! underwent a securitization transaction wherein TBC became Yum!'s alter ego and was assigned all of its duties under the franchise agreements (Doc. 98, ¶ 65). Shortly thereafter, several subsidiaries and affiliates, including TBC, entered

into a management agreement wherein TBC was designated to act as the manager and was delegated to carry out the affiliates' duties and obligations under franchise and licensing agreements (Doc. 98, ¶ 67).

Coons also claims that Yum! exercised sufficient control of the daily operations of the franchises, including the Caseyville restaurant, to be considered a joint employer with Bell (Doc. 98, ¶ 89). Yum! was able to control the POS system, including the fingerprint scanners, that were purchased by the franchisees, including Bell (Doc. 98, ¶ 91). Accordingly, Yum! should have inferred that Bell was using fingerprint technology to clock its employees in and out (*Id.*). Yum! also had a direct impact on franchisee hiring policies, benefits, and programs that were offered to franchisee employees and maintained control over franchisees through its wholly owned subsidiaries (Doc. 98, ¶¶ 96, 99).

TBC and TBF are also joint employers, with TBC being a 100% wholly owned subsidiary of Yum! and the 100% owner of TBF (Doc. 98, ¶ 102)

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") "governs the enforcement, validity, and interpretation of arbitration clauses in commercial contracts in both state and federal courts." *Jain v. de Mere*, 51 F.3d 686, 688 (7th Cir. 1995). Section 2 of the FAA provides that "an agreement in writing to submit to arbitration an existing controversy ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision "embodies both a 'liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract.'" *Gore v. Alltel Communications, LLC*, 666 F.3d

1027, 1032 (7th Cir. 2012).

Under the FAA, "arbitration should be compelled if three elements are present: (1) an enforceable written agreement to arbitrate; (2) a dispute within the scope of the arbitration agreement; and (3) a refusal to arbitrate." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017). As the party seeking arbitration, Defendant[s] bear the burden of proving that Plaintiff "agreed to arbitrate the claim[s] asserted here." See also *Zurich American Ins. Co. v. Watts Industries, Inc.*, 466 F.3d 577, 580 (7th Cir. 2006). "To decide this question, courts apply an evidentiary standard similar to the one that applies at summary judgment, meaning that if the party seeking arbitration offers sufficient evidence to allow a factfinder to conclude that the parties agreed to arbitrate, the party opposing arbitration must identify facts showing a genuine dispute as to the existence of the agreement." *Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002)). "[O]nce an enforceable arbitration contract is shown to exist, questions as to the scope of arbitrable issues should be resolved in favor of arbitration." *Scheurer*, 863 F.3d at 752 (citing *Moses H. Cone*, 460 U.S. at 24-25) ("Once it is clear, however, that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law.").

## ANALYSIS

Before the Court can rule on this motion, the Court must first consider whether there was, in fact, an agreement to arbitrate. Indeed, the Supreme Court has held that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Technologies v.*

*Communications Workers of America,* 475 U.S. 643, 648 (1986). Next, a court must consider whether the parties agreed to arbitrate. *Id.* at 649. It is important to note that a court, in deciding whether the parties have agreed to arbitrate, is not to rule on the potential merits of the underlying claims. *Id.*

In determining whether a valid arbitration agreement exists between parties, federal courts apply the state law principles of contract formation. *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F. 3d 705, 711 (7th Cir. 2019). An enforceable contract under Illinois law requires an offer, acceptance, consideration, and mutual assent. *Nat'l Prod. Workers Union Ins. Trust v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011).

Coons was an "at-will" employee, which is presumed when a person is hired without a fixed term and which is expressly stated in the Bell Manager Handbook (Doc. 137-1, p. 4); see also *Duldudao v. St. Mary of Nazareth Hosp. Ctr.,* 505 N.E.2d 314, 318 (Ill. 1987). An employment agreement signed by an at-will employee can create valid and enforceable contractual rights if the traditional requirements for contract formation exist. *Duldulao,* 505 N.E.2d at 318. While Coons contends that there was no contract, this Court finds the contrary.  Bell offered employment, which was accepted by Coons, and both parties consented to the terms.

Accordingly, this Court moves on to the next step – determining whether a valid arbitration agreement existed. In the motion, defendants point to the document itself, which was entitled, "RECEIPT OF DISPUTE RESOLUTION PROGRAM AND AGREEMENT TO ABIDE BY DISPUTE RESOLUTION PROGRAM" and which was executed by Coons on August 15, 2013 along with Charles W. Brown, the authorized

officer for Bell American Group and its subsidiaries (Doc. 48-2). The entirety of the Dispute Resolution Program ("DRP"), which Coons indicated she had reviewed, set forth how to seek arbitration and the agreement itself stated, "[t]his is an agreement to arbitrate all legal claims" (Doc. 48-3). The DRP also specified that any arbitration would be administered under the American Arbitration Association's rules and expressly stated, "[T]he Federal Arbitration Act shall govern the interpretation, enforcement, and proceedings under this Agreement." (Doc. 48-2). By executing the document, Coons agreed "that any arbitration between the Company and me will be on an individual basis and not as a class or collective action". (*Id.*) Coons further affirmed, **"I understand that by entering into this Agreement, I am giving up my right to have my legal claims against the Company decided in court by a judge or jury."** (*Id.*) (emphasis added).

However, because "the Company" refers to Bell American Group, which was the only signatory beyond Coons, Coons counters that defendants, as non-signatories to the contract, are unable to enforce the agreement to begin with, leaving the Court to address the issue of arbitrability (Doc. 137). She further contends that any claims as to arbitrability must be determined by the Court, not the arbitrator (*Id.*). Notwithstanding her argument, the Court points to the agreement itself which states, "The arbitrators, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, arbitrability, applicability, enforceability or formation of the agreement to arbitrate, including, but not limited to any part of the agreement to arbitrate is void and voidable." (Doc. 137-1, p. 27).

Defendants contend that by signing the document, Coons agreed to a "sweeping"

delegation clause that referred **all** disputes to an arbitrator (Doc. 108). Defendants further contend that the agreement incorporates the rules of the American Arbitration Association ("AAA") is an unmistakable delegation as to questions of arbitrability (*Id.*). This Court concurs. In fact, the Supreme Court has held that a court may not override a contract when the arbitrability question is delegated to an arbitrator. *Henry Schein, Inc. v. Archer and White Sales, Inc.,* 139 S.Ct. 524, 529 (2019). In those circumstances, a court possesses no power to decide the arbitrability issue. *Id.* As such, this Court defers all issues of arbitrability, including the ability of a non-signatory to enforce the agreement, to the arbitrator.

Coons next argues that the arbitration agreement does not apply to non-signatories. A "nonparty's right to enforce an arbitration agreement is governed by state law." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021) (citing *Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 630-631(2009). Furthermore, 'traditional principles' of state law generally "allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel". *Id.* (quoting 21 R. Lord, Williston on Contracts § 57:19, p. 183 (4th ed. 2001)).

In Illinois, a non-signatory to a contract typically has no right to invoke an arbitration provision contained in that contract. See*, e.g.*, *Caligiuri v. First Colony Life Ins. Co.*, 742 N.E.2d 750, 755 (Ill.App.Ct. 2000). However, there are recognized exceptions to that general rule — third-party beneficiary, agency, and equitable estoppel. See *Ervin v. Nokia, Inc.,* 12 N.E.2d 534, 539–41 (Ill.App.Ct. 2004) (applying third-party beneficiary, agency, and equitable estoppel theories in considering a

nonparty's claim to enforce an arbitration agreement). Additionally, the Supreme Court has recognized that arbitration agreements may be enforced by non-signatories through "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.". *GE Power Conversion France SAS, Corp., v. Outokumpo Stainless USA, LLC,* 140 S.Ct. 1637, 1649 (2020).

This Court does not agree with Coons. To the contrary, defendants raise two possible arguments for why the Court should enforce the arbitration agreement, although only one needs to be found for the agreement to be upheld against non-signatories.

In the TAC, Coons alleges the defendants have an agency relationship with Bell, going so far as alleging alter ego and joint employer scenarios. Defendants contend that the agreement is enforceable by them because Coons alleges that Bell's actions should be imputed to the rest of the defendants (Doc. 108, p. 19).

The Seventh Circuit has compelled arbitration where the plaintiff *alleges* a non-signatory has some sort of agency relationship, regardless of whether the allegations are true or disputed. *In re Oil Spill by Amoco Cadiz Off Coast of France Mar. 16, 1978*, 659 F.2d, 759 (7th Cir. 1981) ("Having alleged an agency relationship as the basis for its standing in the suit, [plaintiff] cannot slough off that relationship at will"). Coons does not contest this with contrary law, but instead claims that no such agency relationship was alleged (Doc. 137, p. 19). Plaintiff contends that because she did not say the magic words that Bell American was acting as an agent of the defendants, she can escape her plain accusations of agency (*See* Doc. 98, ¶ 16):

"Specifically, YBI had direct influence and impact on the Taco Bell

franchises and their daily routines, and indirect influences on them through its 100% owned subsidiaries, including TBC. Franchises were required to purchase their supplies, including computer systems and their point of sale or POS systems through … an entity controlled by YBI."

The TAC is riddled with numerous accusations of knowledge, involvement, and control, by defendants, and although Plaintiff may not have explicitly pled an agency relationship, these accusations are more than enough to allege the existence of an agency relationship, as was similarly found in Illinois law by *Walker v. Watson,* 2012 IL App (1st) 111759-U:

> "In her amended complaint, plaintiff Walker alleged, on information and belief, that defendant Watson was a major stockholder of defendant dealership, that he set policies and procedures that permitted his employees to sell previously wrecked cars without disclosing that fact to the prospective buyers. She further alleged that defendant Watson was personally involved in decisions regarding the level of inspection afforded the rebuilt cars and condoned inspections designed not to discover defects. She further alleged that defendant Watson was personally aware of and ratified the decision of his sales manager to sell the damaged vehicle to her."

Coons cannot escape the plain undertones of her suit by claiming that she never outright pled the specifics of agency. Defendants, due to the accusations of knowledge and control over Bell, have the right to enforce the arbitration agreement because of their alleged agency relationship.

The Federal Arbitration Act ("FAA") allows one party to an arbitration agreement to ask the court to put the litigation on hold and force the other party to arbitrate the disputes. 9 U.S.C. § 4. Indeed, Sections 3 and 4 of the FAA describe procedures through which federal courts implement arbitration agreements, stating that courts "shall" stay proceedings and order arbitration upon confirming the existence of an enforceable arbitration agreement that covers the dispute at hand. 9 U.S.C. §§ 3,4. As such, a party

moving for arbitration also implicitly seeks a stay of judicial proceedings.

Notwithstanding the foregoing, the Court has the inherent authority to stay proceedings to "control the disposition of causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936). This authority exists even in the absence of a procedurally valid motion to stay. See *Clinton v. Jones*, 520 U.S. 681, 706 (1997) (discussing district courts' "broad discretion to stay proceedings as an incident to its power to control its own docket"); *Jackson v. Van Kampen Series Fund, Inc.*, No. 06-CV-944, 2007 WL 1532090, at *2 (S.D. Ill. May 24, 2007) (holding that court's inherent authority "includes the power to stay proceedings sua sponte."). As such, this Court will stay further proceedings in this matter pending a decision from the arbitrator. Consequently, the pending motions to dismiss are held in abeyance (Docs. 103, 109).

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Compel Arbitration (Doc. 107) is **GRANTED** in its entirety. As set forth *infra*, all further proceedings in this matter are **STAYED** pending arbitration. The parties are DIRECTED to file a report advising the Court of the status of the arbitration proceeding on or before November 1, 2023.

**IT IS SO ORDERED.**

**DATED:  May 8, 2023**

*/s/ Stephen P. McGlynn*
**STEPHEN P. McGLYNN**
**U.S. District Judge**
